## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

BRENT WILLIAMS,

              Petitioner,

vs.

WARDEN JAMES HAVILAND,

              Respondent.

CASE NO. 3:22-CV-00031

JUDGE JAMES R. KNEPP II

MAGISTRATE JUDGE AMANDA M. KNAPP

**REPORT AND RECOMMENDATION**

       Petitioner Brent Williams ("Petitioner" or "Mr. Williams") filed this habeas corpus petition pursuant to 28 U.S.C. § 2254 with the assistance of counsel on January 6, 2022.  (ECF Doc. 1 ("Petition").)  The Petition pertains to Mr. Williams's conviction of murder following a bench trial and related prison sentence of fifteen years to life in Auglaize County Court of Common Pleas, Case No. 2018 CR 0151.  (ECF Doc. 1; ECF Doc. 6; ECF Doc. 10.)

       The matter was assigned to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  The case is briefed and ripe for disposition.  (ECF Docs. 6 & 10.)  For the reasons set forth herein, the undersigned recommends that the Court **DENY** the Petition.

### I. Factual Background

       "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a

1

State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.  *Id.*; *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

The Third District Court of Appeals summarized the facts underlying Mr. Williams's conviction and sentence as follows:

### Evidence Presented by the State

{¶9} Erin Mulcahy was found dead in the shower at her residence on July 8, 2017. Williams and Erin entered into a relationship approximately two years prior to her death. They were married about a year and three months before Erin died.

{¶10} Williams leased an apartment at 200 Karen Street in Waynesfield where the couple resided until July 2, 2017, when Williams left due to Erin's excessive drinking. By all accounts, Erin had a serious problem with alcohol abuse. She had been to rehab numerous times and she repeatedly relapsed once released from rehab. Erin had even been hospitalized on multiple occasions both for extreme alcohol consumption and for withdrawals that were purportedly giving her seizures.

{¶11} Prior to Williams' decision to leave the residence at 200 Karen Street on July 2, 2017, the relationship between Williams and Erin was tumultuous. Police had been called with regards to domestic disturbances at their residence, Erin had at least one affair, she was in and out of the hospital for her alcohol-related problems, and Erin and Williams apparently argued enough that they had a handwritten contract in March of 2017 stating that Williams would not yell at Erin. By July 2, 2017, Williams claimed he had enough and called a family member to pick him up and he left the residence in the late afternoon. On the night Williams left, phone records show that Erin made eight calls to Williams, leaving him six voicemails, and she sent him a text message stating "Have a nice life."

{¶12} The next day, July 3, 2017, Erin called Williams and left him a voicemail at 6:36 a.m. At 9:59 a.m., Erin messaged Williams stating, "I need the key or I will have the locks changed[.]" A minute later she added, "Plus I am divorcing you." Throughout the rest of the day, Williams and Erin exchanged phone calls, voicemails, and a few text messages. They spoke on the phone over ten times totaling in excess of an hour, though the content of those calls is unknown.

{¶13} Meanwhile, on July 3, 2017, Erin was on the dating site Plenty of Fish. She exchanged messages with Christopher S., whom she had not known previously. Christopher agreed to drive to Waynesfield from Tiffin and pick up some alcohol for Erin, specifically two "tall boys" of beer. (Tr. at 396). After arriving at 200 Karen Street, Christopher and Erin spent some time chatting, then they engaged in consensual vaginal intercourse in Erin's bedroom. Christopher indicated that he

wore a condom, and that he disposed of it in the outside garbage when he left shortly thereafter. Christopher stated that he was at Erin's residence for approximately two hours in the evening, and that after he left he had no further contact with her.[1]

> [FN 1] Notably, there was a gap in phone communication on July 3, 2017, between Williams and Erin from 7:20 p.m. to 10:15 p.m.

{¶14} On the morning of July 4, 2017, Erin left Williams a voicemail. A few hours later Williams left Erin a voicemail, but they had no further phone contact that day.

{¶15} On the morning of July 5, 2017, Williams went to work from 5:56 a.m. to 2:00 p.m. Williams worked at PPG Coating as a production laborer and had janitorial duties. Erin sent Williams a text message at 12:25 p.m. stating, "Hey [c]an you call when you have a chance? I haven't drank since you left." Williams called Erin a few minutes later and they spoke for over eight minutes. At some point after Williams left work on July 5, 2017, Williams provided a check to the Village of Waynesfield for a water bill and he presented that check to the Village. Erin next contacted Williams around 4:30 p.m., leaving two voicemails. Then she began texting him asking if he was going to call her.

{¶16} Around this time, Scott Bowsher, the owner of the apartment at 200 Karen Street, spoke with Erin at her residence. Scott told Erin that she needed to move out because Williams was the only person on the lease and Williams had moved out. Scott also stated that rent had not been paid and Erin had a cat, which was against the terms of the lease. Scott told Erin that she had 24 hours to leave the premises.

{¶17} At 5:24 p.m., Erin sent Williams a text message stating "the landlord just told me I have to move out." She asked Williams to call her. Over the next half hour, Erin made three calls to her father and three calls to Williams, none of which Williams answered.

{¶18} At 5:56 p.m., Erin began sending Williams text messages again, first asking if Williams had paid the rent, then asking Williams to call her, adding, "I'm not going to bug you about coming back tonight." At 6:14 p.m. she made a call to Williams and left a voicemail, then she sent him a text message asking why he would not talk to her. She sent him a picture message at 6:34 p.m. and left Williams another voicemail at 6:35 p.m.

{¶19} At 6:39 p.m., Erin made an eight minute phone call to Kirk S., who had been a friend and lover prior to Erin and Williams' marriage. Kirk testified that Erin was frustrated and panicking about having nowhere to go and about not being able to move out of 200 Karen Street in a day. Kirk tried to reassure her that an eviction process would take longer, and Kirk testified that Erin had calmed down by the end of the call. Kirk was the last person who spoke to Erin while she was alive.

{¶20} There was no further outgoing communication from Erin's phone.

{¶21} Between 6:18 p.m. and 8:35 p.m., Williams' phone showed him as being in the general area of 200 Karen Street in Waynesfield, though data could not show he was at the residence. Cell site tracking showed Williams near different areas of Lima throughout the day, but during these hours he was in the relative area of the residence he previously shared with Erin. Despite Erin's and Williams' phones typically being fairly active, neither phone transmitted any data between 6:48 p.m. and 7:32 p.m.

{¶22} At 7:32 p.m., Williams sent Erin a text message that said, "Why don't u [sic] let me get u [sic] pregnant[?]" At 8:22 p.m., Williams sent a message simply saying, "Hello" to Erin.

{¶23} On July 6, 2017, Williams worked from 5:56 a.m. until 2:02 p.m. During the day, he called Erin three times between 10:59 a.m. and 11:14 a.m., leaving two voicemails. Over the next forty-five minutes Williams sent Erin three text messages stating that they needed to talk, that it was important, and that she had better contact him.

{¶24} At approximately 4:15 p.m., Williams and his father went to the residence at 200 Karen Street together. They went inside and stated that they heard the shower running but they did not see Erin. Williams claimed he got his checkbook from the entertainment center and then left. On the way out of the residence, Williams and his father ran into the landlord, Scott Bowsher, who was working on renovating one of the connected apartments. The apartment at 200 Karen Street was part of a larger building that housed three apartments. The apartments shared a common utility room for water heaters and a breaker panel.

{¶25} Scott asked if Erin was inside the residence at 200 Karen Street because if she was not, he wanted to change the locks. Williams and his father indicated that Erin was inside in the shower and they had only come to grab some of Williams' things. Williams and his father then left the residence. At approximately 4:17 p.m., Williams sent text messages to Erin stating "Did u have a nice shower" and "I was there while u was in the shower[.]" Williams did not attempt any further contact with Erin that evening.

{¶26} On July 7, 2017, Williams worked his shift from 5:56 a.m. until 2:00 p.m. He sent Erin a text message at 1:47 p.m. stating, "U need to leave the apartment your dads [sic] check is not being accepted as rent[.]"

{¶27} On that same date, Williams sent a message to Ruth O. Ruth had known Williams for about three years. Williams asked Ruth if he could see her, and Ruth said no because he was married. Williams responded by stating that he was not married anymore. Ruth replied that she was sorry to hear that but she was not interested.

{¶28} Another woman, Sandra B., testified that Williams sent her a message on July 7, 2017. Sandra stated she had not heard from Williams for over a year. She

4

stated that Williams came to her residence on July 7, 2017, and was insistent that he stay the night. While Williams was at Sandra's residence, he talked about Erin, complaining about marital issues and stating that he and Erin were separated. Sandra thought Williams was anxious and acting unusual. She allowed Williams to stay that night with her but they did not engage in any sexual activity.

{¶29} On July 8, 2017, Scott Bowsher went to the apartment connected to Erin's residence to continue renovation work. While he was there, he noticed that the sump pump was running. He used the crawl space under the building and determined that water was coming through the floor from Erin's apartment. He shut the water off to the apartment using the common utility room, and then Scott tried to call Williams so that he could get permission to enter the apartment. When Scott could not get in touch with Williams, Scott called Williams' father and stated that he needed permission to enter the apartment. Williams' father said he would be over in a couple of minutes to go inside with Scott.

{¶30} When Williams' father arrived at 200 Karen Street shortly thereafter, he went inside the residence with Scott after Scott unlocked the door. Upon reaching the bathroom, Scott realized that Erin's body was in the bottom of the stand-up shower. He immediately dialed 911.

{¶31} First responders arrived at the scene and it was clear that Erin was deceased. She was thirty-five years old when she died. In the event that Erin's death was not natural, other officers responded to the scene to investigate. In addition, a crime scene analyst from BCI, and a certified death investigator/coroner's assistant came to inspect the scene.

{¶32} Witnesses did not recall an odor of decomposition in the bathroom where Erin's body was found. The BCI analyst and the coroner's assistant each took photographs of the scene, finding Erin on her side in a fetal position at the bottom of the stand-up shower. The magnetic glass door to the shower was closed. Witnesses noticed that there was a towel on the toilet seat and clothes were laid out neatly on a hamper as though Erin had intended to get out of the shower. The coroner's assistant noted that Erin did not have rigor mortis, which he testified passed after a period of time.

{¶33} The residence was searched, with Williams' permission, and DNA swabs were taken from various areas. Officers also attempted to obtain fingerprints. There were no signs of a struggle in the residence or in the bathroom and no alcohol was located in the residence. There were also no signs of a forced entry.

{¶34} Erin's phone was in the living room on the couch. Erin's father came to the scene and officers were notified that she had a history with alcoholism and seizures, so Erin's father thought she might have had a seizure.

{¶35} Williams was interviewed outside of the residence while police were still searching inside. The interview was recorded on an officer's body camera. During

the interview, Williams stated that he had not seen Erin since Sunday, July 2. (State's Ex. 18). He allowed officers to photograph the text messages he had exchanged with Erin since he left. The officer interviewing Williams had dealt with Erin in the past and he brought up Erin's alcoholism. Williams indicated that he ultimately left Erin because he did not want to deal with the alcoholism any longer.

{¶36} Williams was asked if Erin was taking her medication, and at that time Williams stated "that's why she had the seizure and died" because she refused to take the medication for alcohol withdrawal. (State's Ex. 18). He stated he had seen her have the seizures before. He also stated that Erin told him she stopped drinking because she wanted to reconcile. Williams indicated that his text regarding getting Erin pregnant was because she would not be able to drink if she was pregnant. Williams provided a DNA sample at the scene.

{¶37} Erin's body was transported to the Lucas County Coroner for an autopsy because the Auglaize County Coroner did not perform autopsies as he was not qualified in forensic medicine. The Lucas County Coroner, Dr. Diane Scala-Barnett, was also a forensic pathologist. She testified extensively at trial regarding her findings in this case, noting that she was aware of Erin's history with alcoholism and her purported seizures.

{¶38} Dr. Scala-Barnett testified that from Erin's appearance she had been dead for 2 to 3 days prior to being found in the shower. Dr. Scala-Barnett testified that being under the cold water in the shower was a mechanism for preservation. She noted that hot water would have accelerated decomposition, but since Erin was in cold water her body was better preserved than it would have been otherwise. Dr. Scala-Barnett testified that Erin being in a fetal position in the shower was inconsistent with falling after a seizure.

{¶39} Dr. Scala-Barnett testified that Erin had injuries around her eye and chin that indicated she was struck or hit recent to the time of death. There was a "fairly extensive hemorrhage" in Erin's "gumline" that could have been from a blow to the mouth or from pushing against something that's over the mouth or chin. (Tr. at 632). Dr. Scala-Barnett testified that she specifically examined a section of the injury to insure that it was not actually from decomposition and she confirmed it was a "real hemorrhage" not an "artifact of decomp." (*Id.*)

{¶40} Dr. Scala-Barnett testified that there was also a hemorrhage inside of the eye that was in "no way part of decomposition." (Tr. at 633). She testified that the specific eye injury observed was common in "asphyxia deaths." (*Id.*) In addition, Dr. Scala-Barnett observed "petechial hemorrhages" or "little tiny hemorrhages" that were seen in asphyxia deaths, but not associated "with seizure deaths." (*Id.* at 633-634). She indicated that petechiae were caused by pressure put on small vessels, "be it pressure around the neck, be it somebody sitting on a chest, be it any reason why there's an increased amount of intrathoracic pressure." (*Id.* at 634). Dr. Scala-Barnett testified that she observed "lots of little tiny petechiae all over" stopping at the neck because that was where the pressure would have been placed.

6

(*Id.* at 635). According to Dr. Scala-Barnett, a chokehold would cause petechial hemorrhaging but not a seizure.

{¶41} Dr. Scala-Barnett also testified that there was a bruise on Erin's right shoulder. Further, she identified a "hemorrhage in the epiglottis, [a] very difficult area to get hemorrhage in, plus it's very protected by all this (indiscernible) on the outside. We see this kind of injury in a strangulation." (Tr. at 638). She testified the injury would not be caused by a seizure because there was no reason to have pressure placed on the neck.

{¶42} Dr. Scala-Barnett testified that the "hyoid" bone was very important in strangulation because it would frequently get broken if there was a "side-to-side compression" but the hyoid bone did not have to be broken in a strangulation. Dr. Scala-Barnett testified that although Erin's hyoid bone was not broken, there was a hemorrhage right over the bone, "right here in the center. There should be no hemorrhage anywhere like this in the neck with a seizure, or any other reason." (Tr. at 638).

{¶43} Dr. Scala-Barnett identified another "hemorrhage at the base of the greater cornu" and a "hemorrhage in the epiglottis" both of which she said were very "characteristic of injuries associated with strangulation and not from decomposition or seizures."[2] (*Id.* at 639-640).

> [FN 2] The State alleged that Williams strangled Erin and moved her body into the shower, constituting the Tampering with Evidence charge. The State supported this theory by the fact that the body was in a neat fetal position and because there were fly eggs on Erin's perineum. Since Erin's legs were closed and the water was on, Dr. Scala-Barnett testified flies would not enter and lay eggs there, leading to the conclusion that the body had been moved.

{¶44} As a result of her findings, Dr. Scala-Barnett determined that Erin had died of strangulation. She summarized the findings that led her to this conclusion, including: the hemorrhage on the right side of the epiglottis, the hemorrhage at the base of the cornu, a focal hemorrhage "in the strap muscles," a hemorrhage in the midline over the hyoid bone, bruising in the mouth at the gumline, a bite mark impression on the tongue[3], sclera in the conjunctiva of the eye, and bulbar hemorrhages and petechiae on the neck. (Tr. at 642-643). Dr. Scala-Barnett testified that she made an incision into the back of the neck looking for hemorrhage in the deep muscle and did not find it, which was significant because it told her that when Erin was being strangled, the pressure was not applied to the back of the neck. (*Id.* at 643).

> [FN 3] Dr. Scala-Barnett did testify that the tongue bite could happen during a seizure but it also occurred in strangulation because pressure on the neck pushes the tongue out. (Tr. at 643).

{¶45} Dr. Scala-Barnett testified that there were different ways that a person could be strangled. She described multiple ways that did not comport with the evidence here; however, she stated a chokehold with one arm across the neck would cause injuries to the front of the neck with no hemorrhages to the back of the neck, similar to here. Another method of strangulation that she felt was consistent with the evidence was a "carotid sleeper" where the "chin is in the crease of the arm and all you need is a little pressure" to make it tight. (Tr. at 645).

{¶46} Dr. Scala-Barnett testified that strangulations can kill by pressing the trachea together, closing off the airway, or closing off the blood flow to and from the brain. Dr. Scala-Barnett testified that in a "carotid sleeper" a person would lose consciousness as quickly as between five to eight seconds, limiting any ability to fight back. (Tr. at 645). Dr. Scala-Barnett testified that she believed that Erin died from either a carotid sleeper or a chokehold. She indicated that she could not disprove a single arm strangulation either. She testified that a carotid sleeper in particular would be consistent with some of the injuries here such as the chin and tongue. Dr. Scala-Barnett testified to a reasonable degree of medical certainty that Erin died of strangulation.

{¶47} As part of the autopsy, Dr. Scala-Barnett took blood and urine samples. In addition, she also took vaginal, oral, and anal swabs. The samples and swabs were sent out for testing. Erin's blood did not contain any alcohol but it had trace amounts of diazepam, nordiazepam, and promethazine. Nordiazepam was a metabolite of diazepam, which was a minor tranquilizer. A toxicologist testified that diazepam was used for anxiety and was also effective as an anticonvulsant for people with seizures or at risk for seizures.[4] The amount of diazepam/nordiazepam present were less than therapeutic levels. In fact, while the amount was enough to detect, it was in such a small quantity that it could not be measured. Further, the toxicologist stated that based on the amount of diazepam in Erin's blood Erin had taken either a very small dose of it closer to death or she had last taken a dose at a more distant time. The toxicologist indicated that the promethazine that was present in Erin's blood was an antihistamine, also in a very small amount.

> [FN 4] Testimony indicated that there was up to a 25 percent mortality rate for individuals withdrawing "cold turkey" from alcohol without medical advice.

{¶48} The vaginal swab that had been taken and tested revealed the presence of semen and sperm tails. DNA samples were extracted and the sperm DNA was consistent with Williams' DNA at a rate rarer than 1 in 1 trillion, with no other contributors identified.

{¶49} There was a significant amount of testimony about the presence of the sperm "tails" and how long they could potentially survive in a live person versus a dead person because Williams eventually claimed that he had sex with Erin before he

moved out of the residence on July 2, 2017. Dr. Scala-Barnett testified that in a living person sperm tails could survive 24-36 hours; however, if a person was killed close to the time the sperm was deposited, the tails would not decompose until the body started to decompose.

{¶50} A forensic scientist from BCI testified that that sperm tails only last eight to twelve hours in a living individual. "They are the first things that usually break off once they are deposited inside a body cavity." (Tr. at 609). He testified that sperm heads could last up to 72 hours and seminal fluid for up to about 96 hours. (*Id.* 615)

{¶51} The Auglaize County Coroner reviewed the evidence in this case, including specifically Dr. Scala-Barnett's autopsy report, evidence from the scene, Erin's medical history, and he concluded that Erin died of strangulation on July 5, 2017, between 6:45 p.m. and 7:32 p.m.

{¶52} Once the coroner ruled Erin's death a homicide, police searched the residence at 200 Karen Street again. The residence had been sealed after the last search when Erin was found, and the second search was conducted July 10, 2017. Chief Motter of the Waynesfield Police Department testified that he was initially surprised by the news that Erin's death was a homicide because they had not really detected signs of "foul play" in the residence.

{¶53} Search warrants were obtained for the phones of Williams and Erin. Extractions were performed on the phones to get the call and messaging history. Location information for the phones was then retrieved. In addition, officers obtained phone records from numerous people including, *inter alia*, Christopher S. and Kirk S.

{¶54} On July 11, 2017, Chief Michael Peterson of the Auglaize County Sheriff's Department received a phone call from Williams, which was recorded. On the phone call, Williams expressed anger that his phone had been seized, stating that it cost him $240 to get out of his phone contract and turn the phone off. He stated that the phone had been deactivated and that it would not work any longer. Williams stated that he felt like the police were "against" him, and that they approached him in an unprofessional manner. (State's Ex. 9).

{¶55} Chief Peterson stated that he thought Williams of all people would want answers regarding Erin's death and Williams responded that he already knew the answers and he already knew how Erin died. He stated that he had nothing to hide, that he was gone when Erin died, and that he had not been to her residence for 3-4 days prior to her death. He then began offering alibi witnesses stating that his parents would vouch for him, and that his brother would as well. He claimed that he had all the witnesses he needed to show he was not present when Erin died.

{¶56} Further, Williams claimed that "everybody" knew Erin had a drinking problem, and that she ultimately consumed so much that her body could not take it any longer. (*Id.*) Williams said that Erin's mother had died from alcoholism and it

9

was terrible that Erin's father was now burying a daughter for the same reason. Williams stated that Erin was trying to stop drinking again, which caused seizures and that was what killed her. He stated that if he was at the residence he could have saved her life.

{¶57} Williams then spoke about feeling a "bond" with Erin that he had never had with anyone in his life but his parents. (State's Ex. 9). Williams stated that it really bothered him that he did not know how many days Erin was in the shower after she "seized," though he said he was "thinking" 2-3 days. (*Id.*) He said he thought what happened was that she bumped her head "hard" in the shower when falling from a seizure. (*Id.*) He claimed he was aware of the seizures because he had taken Erin to the hospital "every two weeks" when Erin was going through withdrawals. He stated he educated himself about alcoholism because of that.[5] (*Id.*)

> [FN 5] A minor inconsistency surfaced through Williams'
> recounting of Erin's alcoholism. In his initial interview that was
> recorded on an officer's body camera he stated that Erin was once
> taken to the hospital and her BAC was .52, yet she was still walking
> and talking. On the phone call with Chief Peterson he cited the same
> or a similar incident but stated Erin's BAC was .42.

{¶58} Chief Peterson stated that having more information about Erin's alcoholism was helpful since he did not know Erin at all prior to her death. Williams stated that he hoped Chief Peterson would remember what he said or write it down. Chief Peterson testified that he thought the conversation was odd and that he also thought that Williams offering alibi witnesses was strange at that point while they were still gathering evidence.

{¶59} As the investigation was ongoing, Williams began to contact other women. The day immediately after Erin's body was found Williams told Sandra B. that Erin had died of a seizure. Williams also contacted Ruth O. again, stating that he was not married any longer. He told Ruth O. that Erin had died of a seizure.

{¶60} Williams met a woman named Tiffany R. on Plenty of Fish a few weeks after Erin died. Tiffany met Williams at a park and they walked around together. Tiffany indicated that Williams spoke about how his wife had died from seizures and that Williams said he had a life insurance policy on her. Tiffany testified that she had a "weird" feeling about Williams because he did not seem to care that his wife was dead and he was already flirting and exchanging provocative pictures only three weeks after her death. Tiffany testified that she was suspicious that Williams had hurt his wife just based on the way he acted.

{¶61} During the course of the investigation it was uncovered that on June 1, 2017, Williams took out a life insurance policy on Erin in the amount of $25,000 through his employment. A representative from his employer did note that it was the first day Williams was actually eligible to sign up for benefits since he had started work on March 27, 2017. Williams signed up for other benefits at the same time.

{¶62} As the investigation continued into the proceeding months, Williams called the Auglaize County Sheriff's Department multiple times, the first being on October 4, 2017. He stated he wanted "his shit," meaning his phone, that he was entitled to it, and that he was tired of the "games" from the police. (State's Ex. 37). Williams stated that he had called the coroner's office in Toledo and that the coroner's office "knew" there was no foul play, that "nothing happened to Erin," and that "she died in the shower" of a "seizure." (*Id.*) "I know it. You know it. There was no foul play. I want my shit. I'm tired of it." (*Id.*) Williams abruptly ended the call.

{¶63} The next call Williams made to the Auglaize County Sheriff's Department was October 12, 2017, wherein Williams stated that he wanted his stuff back again and that he had waited long enough. He said that apparently the police had nothing "on" him or they would have arrested him. He said he did not do anything wrong.

{¶64} Further, Williams stated that the coroner's office in Toledo had all their findings, that they knew the reason why Erin died; however, Williams said the coroner would not tell him. Williams stated that since coroner's office had made their findings he wanted his stuff back. He said, "If you know why she died, then [it's] over with, said and done, right?" (*Id.*)

{¶65} Williams then repeatedly stated that he should get his things back. "Apparently you ain't got nothin' on me or I'd be in jail, correct? Correct? Correct? Correct? You don't have me in jail right? * * * Why ain't I? Why ain't I in jail? I'm asking you." (*Id.*)

{¶66} When the officer said he could not answer that question, Williams said, "Because I didn't do nothing. I did nothing wrong. And you know it. You know it." (*Id.*)

{¶67} The officer replied by stating that when the investigation was complete Williams' property would be returned to him. Williams responded, "Everything is said and done. I want it soon. This—This is over. They know why she passed away. And they know it wasn't from any foul play. They even told me that at the coroner's office in Toledo." (*Id.*)

{¶68} Williams said that the officer needed to call the coroner's office to get the cause of death and give him his stuff back so he could move on with his life. "How would you feel if your wife passed away and you knew the reasoning behind the death, like I know the reasoning behind the death, and you don't even believe a word I'm saying apparently, do you?" (*Id.*) Williams told the officer to get the death certificate to tell him why she died, then he hung up.

{¶69} Notably, Williams challenged the idea that he even *could* strangle Erin to death, first indicating that Erin was slightly taller than him and outweighed him by perhaps fifty pounds. Williams also had Erb's Palsy, which was a birth injury that impacted his right shoulder. Williams contended that Erb's Palsy and surgeries

11

made his right arm essentially useless. However, when Williams applied for his job at PPG Coating he acknowledged that he could lift and move up to 50 pounds on occasion and he stated he did not have any kind of disability.

\*\*\*

Evidence Presented by the Defense

{¶80} In his case-in-chief, Williams presented the testimony of Chad C., Rodney R., and Brad S., three individuals who met Erin through the dating site "Plenty of Fish."[6] Erin had contact with Chad during the first week of July, 2017—the week she died. She invited him to come over to 200 Karen Street but Chad testified he never went there.[7]

> [FN 6] Williams had a number of other witnesses under subpoena, but those witnesses were called by the State so they were examined on cross and released from their subpoenas.

> [FN 7] Erin did not have a car or any income.

{¶81} Williams also presented the testimony of Erin's father, Jim Mulcahy. Jim testified that Erin was always "loaded" from drinking and that she had been to rehab five or six times. He testified that he had taken her to the hospital between three and five times when she was extremely drunk. He stated Erin suffered from seizures, though he never saw one, just the aftermath.

{¶82} Jim testified that he received a phone call from Erin on July 5, 2017, wherein Erin stated she was trying to get "straight" again. Jim told her not to do it by herself because it could kill her.

{¶83} Jim testified that Erin was bipolar. He stated that the last time he saw her was approximately a month before she died.

{¶84} Dr. Werner Spitz, a forensic pathologist and the former chief medical examiner for Wayne County, Michigan, testified via a trial deposition. Dr. Spitz testified that he was 92 years old, that he had performed over 65,000 autopsies, that he had written nearly 100 scientific articles, and that he authored a textbook on forensic pathology. He indicated he had testified in all 50 states and was being paid $4,000 for his work in this matter.

{¶85} Dr. Spitz testified that he received medical records of Erin and Williams. He stated that from the records he thought Erin suffered from "Grand Mal" seizures, which caused contractions in every muscle in the body. He also received the autopsy report and photos to conduct his own evaluation; however, he did not personally examine Erin's body.

{¶86} Dr. Spitz testified that he thought given Erin's history, she had an alcohol withdrawal-related seizure, and that when she had a seizure she fell and hit parts of

12

her upper body, creating some of the injuries seen.[8] At that time she also likely bit her tongue.

> [FN 8] Erin had been hospitalized for alcohol withdrawal-related seizures as recently as June 5, 2017.

{¶87} In his testimony, Dr. Spitz disputed a number of Dr. Scala-Barnett's findings, claiming that many of the injuries Dr. Scala-Barnett observed could just as likely be from decomposition. Dr. Spitz produced a report that contained the following conclusions.

> **The death of Ms. Mulcahy was obviously alcohol related. Her death was predictable. Nothing would have changed this outcome.**
>
> **The presence of hemorrhages as described in the autopsy report in the neck are insufficient to ascribe the death as one due to strangulation considering that blood vessels damaged in a fall on an edge or irregular surface will leak blood and give the impression of trauma.**
>
> **In summary, this woman, 35 year [old] alcoholic with heavy alcohol consumption history and alcohol withdrawal with seizures, nothing in this case justifies the conclusion that the manner of death in this case is homicide.**
>
> **The absence of defense wounds also supports lack of an attack.**
>
> **My opinions are based on my education, training and experience and are rendered to a reasonable degree of medical certainty.**

(Spitz Depo. Def.'s Ex. B). Dr. Spitz concluded his direct testimony by stating he thought there was more evidence needed for a determination of homicide. He felt there was more non-homicidal type of trauma than homicidal.

{¶88} During cross-examination in the trial deposition, Dr. Spitz was combative, though he acknowledged at certain points that he could not explain some hemorrhages, stating that they were minimal in any event. He stated that he saw what could be hemorrhages or decomposition. He testified that he would have to see microscopic slides to tell the difference, which he did not do in this matter, but Dr. Scala-Barnett did. (Spitz Depo. at 78).

{¶89} As to the evidence regarding Williams' semen being located in Erin's vagina, including still having sperm tails, Dr. Spitz broadly stated that "DNA" stayed for a long time and DNA could be there if they had sex three or four days prior. However, he did state that the first thing that sperm lost were the tails, and he did not make proclamations regarding sperm tails, just DNA in general.

{¶90} Williams was the last witness to testify in this case. He testified that Erb's Palsy impacted everything in his daily routine and that he had to compensate for his bad right arm. He stated he had adapted well but it was hard to find employment.

{¶91} Williams testified that he left Erin on July 2, 2017, because he did not want to be there any longer. He testified that her alcoholism and the arguments they had were too much for him. Nevertheless, he stated that he had sex with her the last day he was there.

{¶92} Williams testified that when he left the residence at 200 Karen Street he went to stay with his parents, which was about three miles outside of Waynesfield. He indicated that this likely explained why his phone was shown as in the cell tower area that covered Erin's residence on July 5, 2017.

{¶93} Williams testified he had observed Erin have 8-10 seizures in the past and that during them she would go limp. He testified she was in the hospital almost every other week.

{¶94} As to the life insurance, he stated that he applied for all benefits the first day of his eligibility. He stated that he took out the policy because he thought it would help cover Erin's future funeral expenses. He was wary of Erin's health since she had been in and out of the hospital so much, including being on a ventilator at one point. However, when pressed by the prosecutor, Williams acknowledged that he owed a lot of money on numerous bills and credit cards.

{¶95} Ultimately Williams stated that the last time he saw Erin in person was July 2, 2017. He testified that he did not kill her or move her body.

*State v. Williams*, 2020-Ohio-3616, ¶¶ 9-69, 79-95, 2020 WL 3637988, at *3-10, 12-14 (Ohio App. Ct. 2020); (ECF Doc. 6-1, pp. 101-21, 125-29.)

## II.    Procedural Background

### A.    State Court Conviction

On July 26, 2018, the Auglaize County grand jury indicted Mr. Williams on: one count of murder in violation of R.C. § 2903.02(A) (Count 1), alleging that Mr. Williams purposely caused the death of another; one count of murder in violation of R.C. § 2903.02(B) (Count 2), alleging Mr. Williams caused the death of another as the proximate result of committing or attempting to commit a first or second degree offense of violence; and one count of tampering with evidence in

violation of R.C. § 2921.12(A)(1) (Count 3).  (ECF Doc. 6-1, pp. 5-7.)  Mr. Williams pled not guilty on July 31, 2018.  (*Id*. at pp. 9-10.)

The case was set to commence before a jury on June 3, 2019; however, on that same date, Mr. Williams waived his right to a jury and the case was tried to the bench.  (ECF Doc. 6-1, p. 12; ECF Doc. 6-3, pp. 1, 10-12.)  The trial continued through June 7, 2019.  (ECF Doc. 6-1, p. 14; ECF Doc. 6-3.)  On June 11, 2019, the court found Mr. Williams guilty of the charge in Count 2 (murder) and not guilty of the charges in Count 1 (murder) and Count 3 (tampering with evidence).  (ECF Doc. 6-1, pp. 14-15; ECF Doc. 6-4.)  The court sentenced Mr. Williams to a prison term of fifteen years to life.  (ECF Doc. 6-1, pp. 14-15; ECF Doc. 6-4.)  The court sustained Mr. Williams's objection to being classified as a violent offender under newly enacted R.C. §§ 2903.41 and 2903.42, finding the newly enacted statutory provisions did not apply retroactively to Mr. Williams.  ((ECF Doc. 6-1, p. 17.)

## B.    Direct Appeal

On June 24, 2019, Mr. Williams filed a notice of appeal with the Third District Court of Appeals through appellate counsel.  (ECF Doc. 6-1, pp. 20-23.)  In his November 21, 2019 merit brief (*id.* at pp. 25-60), he raised the following assignments of error:

1.    The trial court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by overruling Appellant's motions for judgment of acquittal and in finding Appellant guilty of murder as the evidence at trial was insufficient to support Appellant's conviction.

2.    The trial court erred in finding Appellant guilty of murder, as the verdict was against the manifest weight of the evidence, thereby depriving Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution.

     3.      The cumulative effect of Appellant's trial counsel's failures deprived Appellant of his rights to a fair trial, the effective assistance of counsel, and due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

(*id*. at pp. 26, 38-53.)  The state filed its brief on December 24, 2019.  (*Id*. at pp. 62-94.)  On July 6, 2020, the Third District Court of Appeals affirmed the judgment of the trial court.  (ECF Doc. 6-1, pp. 96-142.)

Mr. Williams, through counsel, filed a notice of appeal with the Supreme Court of Ohio (ECF Doc. 6-1, pp. 144-45) and a memorandum in support of jurisdiction (*id.* at pp. 147-54) on August 5, 2020, asserting the following proposition of law:

     1.      The trial court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution in finding Appellant guilty of murder, as the evidence at trial was insufficient to support Appellant's conviction.

(*id.* at pp. 148, 151-54.)  On August 25, 2020, the State filed a memorandum in opposition to jurisdiction.  (*Id*. at pp. 156-76.)  On October 13, 2020, the Ohio Supreme Court declined to accept jurisdiction of Mr. Williams's appeal.  (*Id*. at p. 178.)

**C.**     **Federal Habeas Corpus Petition**

Mr. Williams raises only one ground for relief in his federal habeas petition, which is as follows:

**GROUND NUMBER ONE**: Petitioner was denied due process of law by the trial as guaranteed by the Fourteenth Amendment to the United States Constitution by overruling Petitioner's motions for judgment of acquittal and in finding him guilty of murder as the evidence at trial was insufficient to support Appellant's conviction.

(ECF Doc. 1, pp. 5-8.)

16

### III.    Law & Analysis

**A.    Standard of Review Under AEDPA**

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), apply to petitions filed after the effective date of the AEDPA.  *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  "As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies."  *Id.* (citing 28 U.S.C. §§ 2254(a), (b), (c).  Further, if an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application "shall not be granted" unless the adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Pinholster*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).  The burden of proof rests with the petitioner.  *See Pinholster*, 563 U.S. at 181.

Under § 2254(d)(1), "[a] decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a

17

set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)).  As explained by the Supreme Court, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1)" and "therefore cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012).  "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Otte*, 654 F.3d at 599–600 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  "The state court's application of clearly established law must be objectively unreasonable." *Id.*

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting and citing 28 U.S.C. § 2254(d)(2)).  The Sixth Circuit has explained that "[a] state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record[]")(quoting and citing 28 U.S.C. § 2254(d)(2) and § 2254(e)(1)). *Matthews*, 486 F.3d at 889.  "[A] state-court factual determination is not unreasonable merely because the federal

habeas court would have reached a different conclusion in the first instance." *Burt*, 571 U.S. at 18 (internal citations and quotations omitted).

The Supreme Court has explained that under AEDPA "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. The "standard is difficult to meet" and "was meant to be" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id*. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

**B.     Fair Presentation**

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. *See* 28 U.S.C. § 2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts"). To satisfy the

fair presentation requirement, a habeas petitioner must present both the facts and legal theories underpinning his claims to the state courts. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *See, e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 33–34 (2004); *Franklin v. Rose*, 811 F.2d 322, 324–25 (6th Cir. 1987). A constitutional claim for relief must also be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

## C.      Ground One

In his sole ground for relief, Mr. Williams argues federal habeas relief is warranted because his conviction for murder was not supported by sufficient evidence and the Third District Court of Appeals's analysis of his sufficiency claim was unreasonable given the facts. (ECF Doc. 1, pp., 5-8; ECF Doc. 10, pp. 8-12.) Respondent argues that the sufficiency claim articulated in Ground One is without merit. (ECF Doc. 6, pp. 18-27.)

### 1.      Legal Framework for Sufficiency of Evidence Claims

A "sufficiency of the evidence" claim is cognizable on federal habeas review. *See In re Winship*, 397 U.S. 358, 364 (1970). In reviewing such a claim, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

In determining the sufficiency of the evidence, a court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Koneth*, 567 F.3d 191, 205 (6th Cir. 2009); *see also Matthews v. Abramajtys,* 319 F.3d 780,

20

788 (6th Cir. 2003).  This "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original).  "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal citations, quotations, and alterations omitted); *see also Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence").

On federal habeas review, an additional layer of deference applies to questions regarding the sufficiency of the evidence.  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).  "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; [and] second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).  The Sixth Circuit has explained the two-step deferential analysis as follows:

> First, we must ask whether the evidence itself was sufficient to convict under Jackson. The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner].  If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010).  Thus, even if this Court were "to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable."  *Brown*, 567 F.3d at 205 (citing 28 U.S.C. § 2254(d)(2)) (emphasis in original)*; see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).

Consistent with the foregoing framework, the undersigned turns first to Mr. Williams's

claim that there was insufficient evidence to convict him of murder under the *Jackson* standard.

## 2.    Evidence was Sufficient Under *Jackson* to Support Murder Conviction

Mr. Williams argues "the prosecution failed to produce sufficient evidence of murder,"

asserting that "[m]ost, if not all the states evidence relied upon assumptions and speculation on

the part of the police and prosecution."  (ECF Doc. 10, p. 2.)  As the state court of appeals

explained, Mr. Williams was convicted of murder in violation of R.C. § 2903.02(B), which

provides: "No person shall cause the death of another as a proximate result of the offender's

committing or attempting to commit an offense of violence that is a felony of the first or second

degree."  (ECF Doc. 6-1, p. 100, ¶ 7.)  The state court of appeals explained further that:

> The second degree felony offense of violence allegedly committed was Felonious
> Assault in violation of R.C. 2903.11(A)(1), which reads: "No person shall
> knowingly * * * [c]ause serious physical harm to another[.]" Serious physical harm
> is defined in R.C. 2901.01(A)(5) as,
>
> > **(a) Any mental illness or condition of such gravity as would normally**
> > **require hospitalization or prolonged psychiatric treatment;**
> >
> > **(b) Any physical harm that carries a substantial risk of death;**
> >
> > **(c) Any physical harm that involves some permanent incapacity,**
> > **whether partial or total, or that involves some temporary,**
> > **substantial incapacity;**
> >
> > **(d) Any physical harm that involves some permanent disfigurement or**
> > **that involves some temporary, serious disfigurement;**
> >
> > **(e) Any physical harm that involves acute pain of such duration as to**
> > **result in substantial suffering or that involves any degree of prolonged**
> > **or intractable pain.**

(ECF Doc. 6-1, pp. 100-01, ¶ 8 (emphasis in original).)

In arguing that the evidence was insufficient to support his conviction for murder, he

asserts that the "narrative put forth by the prosecution" to support his conviction was "fanciful at

22

best drawn together with circumstantial evidence and bad science." (ECF Doc. 10, p. 12.)  More
particularly, he asserts in both his Petition and Traverse that "two types of circumstantial
evidence" relied upon by the State to support his murder conviction—specifically, cell phone
evidence and sperm tail evidence—were "tenuous at best" and insufficient to support his
conviction. (ECF Doc. 1, pp. 7-8; ECF Doc. 10, pp. 8, 9-10.)  He fairly presented this argument
on direct appeal to the Third District Court of Appeals (ECF Doc. 6-1, pp. 38-42) and the
Supreme Court of Ohio in his memorandum in support of jurisdiction (*id.* at pp. 151-54).

### i.    Cell Phone Evidence

According to the factual findings of the state court of appeals, which are presumed to be
correct under 28 U.S.C. § 2254(e)(1):

> Between 6:18 p.m. and 8:35 p.m. [on July 5, 2017], Williams' phone showed him
> as being in the general area of [Ms. Mulcahy's residence], though data could not
> show that he was at the residence.  Cell site tracking showed Williams near different
> areas of Lima through out the day, but during these hours he was in the relative area
> of the residence he previously shared with Erin.  Despite Erin's and Williams'
> phones typically being fairly active, neither phone transmitted any data between
> 6:48 p.m. and 7:32 p.m.
>
> [] At 7:32 p.m., Williams sent Erin a text message that said, "Why don't u [sic] let
> me get u [sic] pregnant[?]  At 8:22 p.m., Williams sent a message simply saying,
> "Hello" to Erin.

(ECF Doc. 6-1, p. 105, ¶¶ 21, 22.)  After reviewing the autopsy report, evidence from the scene,
and Ms. Mulcahy's medical history, the Auglaize County Coroner concluded that Ms. Mulcahy
died of strangulation on July 5, 2017, between 6:45 p.m. and 7:32 p.m.  (*Id.* at p. 115, ¶ 51.)

Mr. Williams argues that the above cell phone evidence, which provides circumstantial
support for a conclusion that Mr. Williams was in the vicinity of Ms. Mulcahy's residence at the
time of her death, was "incomplete at best" because the testifying analyst: could not testify
regarding factors that would interfere with cell phone tower pings; only testified to cell phone
tower data for the beginning and end of the calls; did not testify to other cell phones that would

have pinged during the calls; could not testify about the process to track a person from one cell phone tower to another; could not testify about the radius of the cell phone tower; and could not testify about signal strength and coverage.  (ECF Doc. 1, p. 8; ECF Doc. 10, p. 9 (citing ECF Doc. 6-3, pp. 590, 591).)  Mr. Williams also asserts that the initial ping for one call was near Mr. Williams's work as well as Mr. Mulcahy's home (ECF Doc. 1, p. 8), and that Mr. Williams's parents lived within the range of the cell phone tower (ECF Doc. 10, p. 9).  He therefore argues that the evidence "proved only that [he] was in the town that he grew up in and where his parents still lived." (*Id.*)  Conversely, Respondent argues that the cell phone evidence supports a finding that Mr. Williams committed the murder, as it "was not only important in placing Williams at the location of the crime, but the inactivity of both Erin's and Williams's phone during that time suggested that was when Williams committed the murder of Erin."  ECF Doc. 6, p. 24.)

The relevant trial testimony was that of Criminal Intelligence Analyst Beth Dailey, who testified that her job was to collect and compile information for investigators at the Ohio Attorney General's Bureau of Criminal Investigation.  (ECF Doc. 6-3, pp. 563-64.)  In this case, she organized and compiled both telephone call records from the telephone carrier and extraction data from the forensic extraction of the devices.  (*Id.* at p. 565.)  From this data, she testified at trial regarding a map that displayed the locations of cellular telephone towers for calls listed in the phone records for specific phones on July 5, 2017, including calls from Mr. Williams's and Ms. Mulcahy's phones.  (*Id.* at pp. 574-82.)  Consistent with the court of appeals's findings, Ms. Dailey's testimony reflects that Mr. Williams's phone used various cell towers earlier in the day, but was using a tower near Waynesfield at 3:55 p.m., 5:34 p.m., 6:18 p.m., and 8:35 p.m.  (*Id.*) On cross examination, Ms. Dailey testified that she could not speak to the radius of the cell

tower, how calls are tracked from tower to tower, or the signal strength or coverage of a cell

tower because she was not employed by the phone company.  (*Id.* at pp. 590-91.)

### ii.    Sperm Tail Evidence

The court of appeals also made factual findings regarding "sperm tail" evidence that was

presented at trial, and those findings are presumed to be correct under 28 U.S.C. § 2254(e)(1).

After noting that a vaginal swab was taken during Ms. Mulcahy's autopsy, the court explained:

> The vaginal swab that had been taken and tested revealed the presence of semen
> and sperm tails. DNA samples were extracted and the sperm DNA was consistent
> with Williams' DNA at a rate rarer than 1 in 1 trillion, with no other contributors
> identified.
>
> [] There was a significant amount of testimony about the presence of the sperm
> "tails" and how long they could potentially survive in a live person versus a dead
> person because Williams eventually claimed that he had sex with Erin before he
> moved out of the residence on July 2, 2017. Dr. Scala-Barnett testified that in a
> living person sperm tails could survive 24-36 hours; however, if a person was killed
> close to the time the sperm was deposited, the tails would not decompose until the
> body started to decompose.
>
> [] A forensic scientist from BCI testified that that sperm tails only last eight to
> twelve hours in a living individual. "They are the first things that usually break off
> once they are deposited inside a body cavity." (Tr. at 609). He testified that sperm
> heads could last up to 72 hours and seminal fluid for up to about 96 hours. (*Id.* 615)

(ECF Doc. 6-1, pp. 114-15, ¶¶ 48-50.)  But the court also noted that Mr. Williams provided

expert testimony from a forensic pathologist, Dr. Werner Spitz, as follows:

> As to the evidence regarding Williams' semen being located in Erin's vagina,
> including still having sperm tails, Dr. Spitz broadly stated that "DNA" stayed for a
> long time and DNA could be there if they had sex three or four days prior. However,
> he did state that the first thing that sperm lost were the tails, and he did not make
> proclamations regarding sperm tails, just DNA in general.

(*Id.* at p. 128, ¶ 189.)  Mr. Williams testified that he last had sex with Ms. Mulcahy on July 2,

2017, the last day he says he saw her alive.  (*Id.* at pp. 128, 129, ¶¶ 91. 95.)  As discussed above,

the Auglaize County Coroner concluded that Ms. Mulcahy died of strangulation on July 5, 2017,

between 6:45 p.m. and 7:32 p.m.  (*Id.* at p. 115, ¶ 51.)

Mr. Williams argues that the state's witnesses offered "conflicting testimony regarding the length of time sperm and sperm tails survive in a living individual," with the fastest reported deterioration rate being "eight to twelve hours after intercourse, wherein sperm stop deteriorating upon an individual's death."  (ECF Doc. 1, p. 8.)  Even if this expert testimony is taken as true, Mr. Williams argues that the evidence does not support the state's theory because the evidence establishes that Mr. William was at work eight to twelve hours before Ms. Mulcahy's time of death as determined by the coroner.  (*Id.*)  On the other hand, he argues that the testimony of his own expert, Dr. Spitz, corroborates a theory that he last had sex with Ms. Mulcahy on July 2, 2017, and that she passed away from a seizure on July 5, 2017.  (ECF Doc. 10, pp. 9-10.)

Respondent argues, conversely, that none of the expert evidence supports the survival of "the more fragile sperm tails" from July 2 until Ms. Mulcahy's death on July 5.  (ECF Doc. 6, p. 25.)  Respondent also argues that Mr. Williams's hypothesis—that he would have had to have sex with Ms. Mulcahy on the morning of July 5, while he was at work, for the State's theory to be correct—is "flawed" because the state's projected timeline for the deterioration of sperm tails would also work if Mr. Williams "had sexual intercourse with his estranged wife . . . just before murdering her, as the state believed[.]"  (*Id.* at p. 26 (citing ECF Doc. 6-3, p. 821).)

### iii.    Other Evidence Suggestive of Guilt

Although the Petition focuses on the inadequacy of the two types of circumstantial evidence discussed above (ECF Doc. 1, pp. 7-8), Respondent also argues that there were "other critical pieces of evidence which implicated Williams as the murderer," including: (1) the door to the apartment was locked with no signs of forced entry when Ms. Mulcahy's body was discovered, and Mr. Williams was one of three people who had a key; (2) Mr. Williams had a financial motive for killing his wife, in the form of a life insurance policy that took effect on

June 1, 2017, and under which he filed a claim on July 24, 2017; and (3) various other identified behaviors by Mr. Williams were suggestive of guilt. (ECF Doc. 6, pp. 26-27.) In response, Mr. Williams challenges the significance of the evidence relating to the lack of forced entry and the importance of the life insurance policy in establishing motive. (ECF Doc. 10, pp. 9-10.) [1]

### iv.  Sufficiency of the Evidence Under the *Jackson* Standard

In assessing the sufficiency of the evidence, this Court must "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the [trier of fact]." *Brown*, 567 F.3d at 205. Rather than focusing on whether the trier of fact "made the correct guilt or innocence determination," this Court must instead consider whether they "made a *rational* decision to convict or acquit." *Herrera*, 506 U.S. at 402 (emphasis in original). And when assessing whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the Court must view "the evidence in the light most favorable to the prosecution." *See Jackson*, 443 U.S. at 319 (emphasis in original). Indeed, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

Applying this standard to the evidence at issue, the undersigned concludes that Mr. Williams has failed to demonstrate that "no rational trier of fact could have agreed with the [trier

---

[1] Mr. Williams also highlights various pieces of evidence that he asserts are at odds with a conclusion that Ms. Mulcahy's cause of death was strangulation or that Mr. Williams was physically able to strangle Ms. Mulcahy. (ECF Doc. 10, pp. 10-14.) But his challenge to the conclusion that strangulation was the cause of death was presented for the first time in the Traverse and is not responsive to specific arguments raised in the Return of Writ. Thus, his arguments regarding the sufficiency of the evidence to establish strangulation as the cause of death need not be considered by this Court. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005). Further, although Mr. Williams addressed the cause of death with the state court of appeals, he only did so in connection with the assignment of error regarding the manifest weight of the evidence (ECF Doc. 6-1, pp. 42-46), which he did not present to the Supreme Court of Ohio (ECF Doc. 6-1, pp. 151-54; ECF Doc. 1, p. 4). Thus, Mr. Williams did not "fairly present" any challenge to the finding that strangulation was the cause of death before the state courts, and such a challenge is not properly before this Court. *See McMeans*, 228 F.3d at 681.

of fact]" that Mr. Williams was guilty of murder. *Coleman*, 566 U.S. at 651. First, viewing the cell phone evidence in the light most favorable to the prosecution, a rational trier of fact could find that evidence supportive of a conviction because it placed Mr. Williams in the general vicinity of the murder at the time the crime was committed and indicated that neither Mr. Williams's nor the victim's phones were in use at the time of the murder. Second, viewing the sperm tail evidence in the light most favorable to the prosecution, a rational trier of fact could find the evidence supportive of a conviction because it suggests Mr. Williams was in physical contact with the victim later than July 2, 2017, and is consistent with a conclusion that Mr. Williams was in physical contact with the victim shortly before her death. The remainder of the evidence—including the lack of signs of forced entry, Mr. Williams's possession of a key to the apartment, the life insurance policy Mr. Williams took out on the victim shortly before her death and attempted to collect on shortly after her death, and noted behavior by Mr. Williams that may suggest consciousness of guilt—when viewed in the light most favorable to the prosecution, is also supportive of a finding of guilt by a rational trier of fact.

For the reasons set forth above, the undersigned concludes that Mr. Williams's sufficiency claim is without merit and the Court may therefore end its inquiry. *See Stewart*, 595 F.3d at 653 (explaining that "[t]he inquiry ends if the [court] determines that there was sufficient evidence to convict [the petitioner]"). But even if this Court were "to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205 (emphasis in original); *see also White*, 602 F.3d at 710. Accordingly, in the interest of completeness, the undersigned turns next to Mr. Williams's challenge to the state court of appeals's sufficiency determination.

### 3.     The Sufficiency Determination of the State Court of Appeals was Reasonable

The state court of appeals addressed Mr. Williams's sufficiency claim as follows:

{¶5} In his first assignment of error, Williams claims that the trial court erred by denying his motions for acquittal because the State presented insufficient evidence to convict him.

#### Standard of Review

{¶6} An appellate court reviews the denial of a Crim.R. 29 motion for acquittal under the same standard used to review a sufficiency of the evidence claim. *State v. Anders*, 3d Dist. Hancock No. 5-16-27, 2017-Ohio-2589, ¶ 32, citing *State v. Carter*, 72 Ohio St.3d 545, 553, 1995-Ohio-104. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19 (an appellate court's function in a sufficiency review is not to determine if the evidence *should* be believed). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Ford*, —— Ohio St.3d ——, 2019-Ohio-4539, ¶ 317. "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.); *see also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence.").

#### Controlling Statutes

{¶7} In this case, Williams was convicted of Murder in violation of R.C. 2903.02(B), which reads: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]"

{¶8} The second degree felony offense of violence allegedly committed was Felonious Assault in violation of R.C. 2903.11(A)(1), which reads: "No person shall knowingly * * * [c]ause serious physical harm to another[.]" Serious physical harm is defined in R.C. 2901.01(A)(5) as,

**(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;**

**(b) Any physical harm that carries a substantial risk of death;**

**(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;**

**(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;**

**(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.**

***

Analysis

{¶71} Looking at the evidence in the light most favorable to the State in this matter as we are directed on appeal, there was sufficient evidence to establish that Erin died as a result of strangulation. Dr. Scala-Barnett testified to a reasonable degree of medical certainty that Erin was killed by strangulation. In addition, Dr. Scala-Barnett went through the possible strangulation methods that were consistent with the evidence she found on the body. She also testified that in a seizure-related death, it would be unnatural for the body to fall into a relatively perfect fetal position.

{¶72} Further, Dr. Scala-Barnett testified that a chokehold could result in physical harm that carried a substantial risk of death and that being strangled to the point of unconsciousness would involve a temporary substantial incapacity. Both of these statements would satisfy the "serious physical harm" element of Felonious Assault, and the fact that Erin died from the strangulation leads to a reasonable conclusion that she died as a proximate result of a Felonious Assault. The findings made by Dr. Scala-Barnett were reviewed by the Auglaize County Coroner and he agreed that Erin died by strangulation. Thus the evidence was sufficient to find that Erin died by strangulation. *See State v. McFeeture*, 8th Dist. Cuyahoga No. 100434, 2015-Ohio-1814, ¶ 45 (finding expert testimony regarding cause of death was sufficient to find victim died by chronic intoxication of a chemical found in antifreeze); *see also State v. Coleman*, 45 Ohio St.3d 298, 307 (1989) (testimony from coroner's office that cause of death was homicidal asphyxia sufficient to establish cause of death).

{¶73} The remaining question then is whether the State presented sufficient evidence that Williams was the individual who strangled Erin to death. To that end, the State established that Williams had a potential motive through the life insurance policy he had on Erin. Williams and Erin also had a tumultuous relationship and Erin had recently slept with other men, which also provided means of a motive.

{¶74} As to Williams' actual whereabouts at Erin's time of death, the State presented evidence that Williams was in the general area of 200 Karen Street through cell phone tower data. In addition, Williams' semen, containing sperm tails, was found inside Erin's vagina despite the fact that Williams claimed he had not had sex with Erin since July 2. If Williams had intercourse with Erin on July 2, 2017, as he said, the expert testimony indicated that the sperm tails would have been gone, at most, 36 hours later. However, if he had sex with her in closer proximity to her death, then the sperm tails could still be there when the body was found three days later. This supports an inference that Williams not only in the area, but also with Erin. This is particularly true given that Williams had a key to the residence and the door was locked when he reentered with his father on July 6, 2017, to get his "checkbook."

{¶75} Moreover, Williams made several troubling statements in this case, repeatedly stating that Erin had died of a seizure while the matter was still being investigated. A woman he knew also thought he was acting anxious the day before Erin's body was found and when Williams called the police at one point he stated that he had talked to the coroner and was told that no "foul play" was involved, despite the fact that the coroner never made such a finding. Additionally, Williams also testified that he returned to 200 Karen Street with his father on July 6, 2017, to retrieve his checkbook. However, an employee from the Village of Waynesfield testified that Williams presented her with a check on July 5, 2017, indicating that he may have already had his checkbook. Thus the evidence places Williams with Erin, provides him with some motive, and his actions were suspicious.

{¶76} When analyzing the evidence in the light most favorable to the State, we find that there was sufficient circumstantial evidence to find that Williams was the individual who strangled Erin to death. *See State v. Franklin*, 62 Ohio St.3d 118, 124, citing *State v. Nicely*, 39 Ohio St.3d 147, 154-155 (1988) ("[a] conviction can be sustained based on circumstantial evidence alone."). Therefore, Williams' first assignment of error is overruled.

*Williams*, 2020-Ohio-3616, ¶¶ 5-8, 71-76, 2020 WL 3637988, at *2, 10-11; (ECF Doc. 6-1, pp. 99-101, 121-24.)

Mr. Williams does not dispute that the state court of appeals court correctly described the sufficiency of evidence standard (ECF Doc. 1, p. 6), but argues the state court of appeals's sufficiency determination was unreasonable given the facts and that federal habeas relief is therefore warranted. (ECF Doc. 1, pp. 6-8; ECF Doc. 10, pp. 5-12.) He argues that the state court of appeals's reliance on cell phone evidence and evidence regarding the length of time that

sperm tails would deteriorate to support its "inference that [Mr.] Williams [was] not only in the area, but also with Erin" at her time of death was an unreasonable determination in light of the evidence. (ECF Doc. 1, pp. 6, 7-8; ECF Doc. 10, pp. 8, 9-10.)

Before turning to Mr. Williams's arguments, the undersigned observes that his burden to obtain relief under AEDPA is demanding. First, under 28 U.S.C. § 2254(d)(1), "[a] state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Otte*, 654 F.3d at 599–600 (quoting *Williams*, 529 U.S. at 413). "This is a difficult standard for any petitioner to meet." *Id.* at 600. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer*, 538 U.S. at 75. "The state court's application of clearly established law must be objectively unreasonable." *Id.*

Second, under § 2254(d)(2), when a petitioner like Mr. Williams "challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt*, 571 U.S. at 18. The Sixth Circuit has explained that "[a] state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record[]") (quoting and citing 28 U.S.C. § 2254(d)(2) and § 2254(e)(1)). *Matthews*, 486 F.3d at 889. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt*, 571 U.S. at 18 (internal citations and quotations omitted).

Third, under the second layer of deference applied to federal habeas review of sufficiency claims under AEDPA, the question is not whether this Court finds the state court appeals's determination incorrect, but rather "whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [Mr. Williams] guilty beyond a reasonable doubt based upon the evidence introduced at trial." *Brown*, 567 F.3d at 205 (emphasis in original). Mr. Williams "'must show that the state court's ruling on [his] [sufficiency] claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby*, 565 U.S. at 24 (quoting *Harrington*, 562 U.S. at 103). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102.

Keeping in mind the high deference afforded state court determinations under AEDPA, the undersigned turns to Mr. Williams's challenges to the state court of appeals reliance on cell phone tower data and sperm evidence to support its determination that there was sufficient evidence upon which any rational trier of fact could have found beyond a reasonable doubt that Mr. Williams committed the murder of his wife.

### i. State Court of Appeals's Finding that Cell Phone Evidence Showed Petitioner Was in the General Area of 200 Karen Street at the Time of the Victim's Death Was Not Unreasonable

The court of appeals considered the following cell phone evidence pertaining to July 5, 2017, the day that Ms. Mulcahy died:

{¶15} On the morning of July 5, 2017, Williams went to work from 5:56 a.m. to 2:00 p.m. Williams worked at PPG Coating as a production laborer and had janitorial duties. Erin sent Williams a text message at 12:25 p.m. stating, "Hey [c]an you call when you have a chance? I haven't drank since you left." Williams called Erin a few minutes later and they spoke for over eight minutes. At some point after Williams left work on July 5, 2017, Williams provided a check to the Village of Waynesfield for a water bill and he presented that check to the Village. Erin next

33

contacted Williams around 4:30 p.m., leaving two voicemails. Then she began texting him asking if he was going to call her.

{¶16} Around this time, Scott Bowsher, the owner of the apartment at 200 Karen Street, spoke with Erin at her residence. Scott told Erin that she needed to move out because Williams was the only person on the lease and Williams had moved out. Scott also stated that rent had not been paid and Erin had a cat, which was against the terms of the lease. Scott told Erin that she had 24 hours to leave the premises.

{¶17} At 5:24 p.m., Erin sent Williams a text message stating "the landlord just told me I have to move out." She asked Williams to call her. Over the next half hour, Erin made three calls to her father and three calls to Williams, none of which Williams answered.

{¶18} At 5:56 p.m., Erin began sending Williams text messages again, first asking if Williams had paid the rent, then asking Williams to call her, adding, "I'm not going to bug you about coming back tonight." At 6:14 p.m. she made a call to Williams and left a voicemail, then she sent him a text message asking why he would not talk to her. She sent him a picture message at 6:34 p.m. and left Williams another voicemail at 6:35 p.m.

{¶19} At 6:39 p.m., Erin made an eight minute phone call to Kirk S., who had been a friend and lover prior to Erin and Williams' marriage. Kirk testified that Erin was frustrated and panicking about having nowhere to go and about not being able to move out of 200 Karen Street in a day. Kirk tried to reassure her that an eviction process would take longer, and Kirk testified that Erin had calmed down by the end of the call. Kirk was the last person who spoke to Erin while she was alive.

{¶20} There was no further outgoing communication from Erin's phone.

{¶21} Between 6:18 p.m. and 8:35 p.m., Williams' phone showed him as being in the general area of 200 Karen Street in Waynesfield, though data could not show he was at the residence. Cell site tracking showed Williams near different areas of Lima throughout the day, but during these hours he was in the relative area of the residence he previously shared with Erin. Despite Erin's and Williams' phones typically being fairly active, neither phone transmitted any data between 6:48 p.m. and 7:32 p.m.

{¶22} At 7:32 p.m., Williams sent Erin a text message that said, "Why don't u [sic] let me get u [sic] pregnant[?]" At 8:22 p.m., Williams sent a message simply saying, "Hello" to Erin.

(ECF Doc. 6-1, pp. 103-05.)  The court also considered Mr. Williams's testimony that "when he left the residence at 200 Karen Street he went to stay with his parents, which was about three

miles outside of Waynesfield," and his testimony that this "likely explained why his phone was shown as in the cell tower area that covered Erin's residence on July 5, 2017."  (ECF Doc. 6-1, p. 128, ¶ 92.)  Construing the cell phone evidence in the light most favorable to the prosecution, the court of appeals found that "the State presented evidence that Williams was in the general area of 200 Karen Street through cell phone tower data" at the time of Ms. Mulcahy's death.  (ECF Doc. 6-1, p. 122, ¶ 73.)

Mr. Williams contends that this determination was unreasonable because the "cell phone evidence was incomplete, at best," (ECF Doc. 1, p. 8), arguing specifically that the State's witness, Ms. Dailey[2]: testified that the cell phone tower pinged at a certain time, but could not "testify what other factors would interfere with said pings"; "only testified to two cell phone towers data, one at the start and end of the call"; "did not testify to other cell phones that would have pinged during that call" (*id.*); could not "[t]estify about the process to track a person from one cell phone tower to another cell phone tower"; could not "[t]estify about the radius of a cell phone tower"; and could not "[t]estify about the signal strength or coverage" (ECF Doc. 10, pp. 8-9 (citing ECF Doc. 6-3, pp. 590-91)).

In his Petition, Mr. Williams also suggests that the state court of appeals's determination as unreasonable because "the cell phone tower that initially pinged the call discussed in trial was near both the decedent's home and Petitioner's work" and he "made this call right after he left work." (ECF Doc. 1, p. 8.)  In his Traverse, he argues that Ms. Dailey "admitted that Petitioner's parents lived in Waynesfield and that area would include the cell phone tower."  (ECF Doc. 10, p. 9 (citing ECF Doc. 6-3, pp 590-91).)  Thus, he contends that the cell phone evidence "proved only that [he] was in the town that he grew up in and where his parents still lived" and the

---

[2] Petitioner refers to the State's witness who testified regarding the cell phone data as "Bailey."  (ECF Doc. 10, p. 8.) However, the witness's last name is Dailey.  (ECF Doc. 6-3, p. 563-64.)

"evidence cannot pinpoint . . . [him] to the home of the victim."  (ECF Doc. 10, p. 9.)  He further asserts that "[n]othing about the cell phone records indicates there was animosity or anger towards the decedent."  (*Id*.)

At trial, Ms. Dailey testified regarding cell phone data from phones multiple of individuals, including Petitioner and Ms. Mulcahy, on July 5, 2017, and in the days leading up to and following Ms. Mulcahy's death.  (ECF Doc. 6-3, pp. 569-87.)  Ms. Dailey testified that cell site 620 was the closest cell tower to 200 Karen Street in Waynesfield, Ohio. (ECF Doc. 6-3, pp. 580-81, 582.)  Ms. Dailey testified that Mr. Williams's cell phone location data showed his cell phone tracking to cell site 620 between 6:18:14 and 8:35:43 p.m. on July 5, 2017.  (*Id*. at p. 582.)  She also testified that the last text message or call from Ms. Mulcahy's phone to Mr. Williams's phone was at 6:35 p.m. on July 5, 2017.  (*Id*. at p. 573.)  The last text or phone call to anyone from Ms. Mulcahy's phone occurred at 6:39 p.m. on July 5, 2017, a call to Kirk Simpson for approximately eight minutes.  (*Id*. at pp. 573-74.)  There were two incoming text messages to Ms. Mulcahy's phone from Mr. Williams's phone after her last outgoing call to Mr. Williams. (*Id*. at p. 574.)  The first came at 7:32 p.m. and read "Why don't [you] let me get [you] pregnant?"  (*Id*.)  And then at 8:22 p.m., there was a text from Mr. Williams's phone to Ms. Mulcahy's phone that read "Hello."  (*Id*.)

The Sixth Circuit has explained that "[a] state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record."  *Matthews*, 486 F.3d at 889 (quoting and citing 28 U.S.C. § 2254(d)(2) and § 2254(e)(1)).  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a

different conclusion in the first instance." *Burt*, 571 U.S. at 18 (internal citations and quotations omitted).  Thus, to demonstrate that the state court of appeals's determination was unreasonable, Mr. Williams must do more than offer an alternative theory; he must rebut the state court of appeals's presumptively correct factual findings by clear and convincing evidence.  He has not done so here.

Mr. Williams challenges the completeness or reliability of Ms. Dailey's testimony and contends that the evidence could show that he was in a different location at the time of Ms. Mulcahy's death.  However, the trier of fact heard the evidence firsthand and reached a different conclusion.  *Brown*, 567 F.3d at 205 (explaining that when addressing a sufficiency of the evidence challenge, the court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury").  Additionally, the court of appeals considered the entirety of the evidence, including Mr. Williams's testimony that "when he left the residence at 200 Karen Street he went to stay with his parents, which was about three miles outside of Waynesfield," and his testimony that this "likely explained why his phone was shown as in the cell tower area that covered Erin's residence on July 5, 2017." (ECF Doc. 6-1, p. 128, ¶ 92.)  Construing the evidence in the light most favorable to the prosecution as is required when evaluating a sufficiency of the evidence claim, the court of appeals reasonably found sufficient evidence to support the prosecution's theory.

As to Mr. Williams's challenge to the completeness of Ms. Dailey's testimony, the record shows that Mr. Williams, through his counsel, cross-examined Ms. Dailey.  (ECF Doc. 6-3, pp. 587-92.)  Further, when considering the evidence and reaching its determination, the court of appeals acknowledged that the data could not show that Mr. Williams was at the actual residence and that "[c]ell site tracking showed Williams near different areas of Lima throughout the day."

(ECF Doc. 6-1, p. 105, ¶ 21.) But the court of appeals noted: "during these hours [Mr. Williams]

was in the relative area of the residence he previously shared with Erin" and "[d]espite Erin's

and Williams' phones typically being fairly active, neither phone transmitted any data between

6:48 p.m. and 7:32 p.m." (*Id.*) Thus, the court of appeals considered the entirety of the evidence

when concluding that Mr. Williams's sufficiency of the evidence argument was without merit.

The sufficiency standard as set forth by the Supreme Court requires that evidence be

viewed "in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319, and

"[c]ircumstantial evidence alone is sufficient to support a conviction," *Johnson*, 200 F.3d at 992.

Under this standard, Mr. Williams's contention that the state court of appeals' determination is

unreasonable due to a lack of direct evidence is unavailing. The undersigned cannot find that the

state court of appeals unreasonably applied *Jackson*. Further, given the totality of the evidence,

the undersigned also cannot conclude that the state court of appeals' determination that Mr.

Williams was in the general area of 200 Karen Street at the time of Ms. Mulcahy's death was

based on an unreasonable determination of facts in light of the evidence.

> **ii.** **State Court of Appeals's Finding that Presence of Sperm Tails in Victim Showed Petitioner Was with Victim at the Time of Her Death Was Not Unreasonable**

The court of appeals detailed evidence presented at trial regarding the presence of sperm

tails in the victim and the deterioration rates of sperm and sperm tails, stating:

> {¶48} The vaginal swab that had been taken and tested revealed the presence of semen and sperm tails. DNA samples were extracted and the sperm DNA was consistent with Williams' DNA at a rate rarer than 1 in 1 trillion, with no other contributors identified.

> {¶49} There was a significant amount of testimony about the presence of the sperm "tails" and how long they could potentially survive in a live person versus a dead person because Williams eventually claimed that he had sex with Erin before he moved out of the residence on July 2, 2017. Dr. Scala-Barnett testified that in a living person sperm tails could survive 24-36 hours; however, if a person was killed

close to the time the sperm was deposited, the tails would not decompose until the body started to decompose.

{¶50} A forensic scientist from BCI testified that that sperm tails only last eight to twelve hours in a living individual. "They are the first things that usually break off once they are deposited inside a body cavity." (Tr. at 609). He testified that sperm heads could last up to 72 hours and seminal fluid for up to about 96 hours. (*Id.* 615)

(ECF Doc. 6-1, pp. 114-15.)  The court of appeals also considered evidence from Mr. Williams's

expert Dr. Spitz, explaining:

{¶89} As to the evidence regarding Williams' semen being located in Erin's vagina, including still having sperm tails, Dr. Spitz broadly stated that "DNA" stayed for a long time and DNA could be there if they had sex three or four days prior. However, he did state that the first thing that sperm lost were the tails, and he did not make proclamations regarding sperm tails, just DNA in general.

(*Id*. at p. 128.)  Construing the evidence regarding sperm in the light most favorable to the

prosecution, the court of appeals found that the presence of sperm tails in the victim supported

the inference that Mr. Williams was with the victim on the night of her death, not only in the

general area.  (ECF Doc. 6-1, pp. 122-23, ¶ 74.)  The court explained:

Williams' semen, containing sperm tails, was found inside Erin's vagina despite the fact that Williams claimed he had not had sex with Erin since July 2. If Williams had intercourse with Erin on July 2, 2017, as he said, the expert testimony indicated that the sperm tails would have been gone, at most, 36 hours later. However, if he had sex with her in closer proximity to her death, then the sperm tails could still be there when the body was found three days later. This supports an inference that Williams not only in the area, but also with Erin. This is particularly true given that Williams had a key to the residence and the door was locked when he reentered with his father on July 6, 2017, to get his "checkbook."

(*Id*. (emphasis added).)  The court of appeals also explained in its decision that:

Testimony indicated that while some seminal *fluid* could stay in a vagina for days, *sperm tails* were some of the first things to break off and usually did not last longer than 8-12 hours in a live woman. Nevertheless, if they were deposited close to the time of death, testimony indicated that they would not degrade until the body started to degrade. Thus here a fair inference could be made that since the body was reasonably well preserved in the cold running shower water, not all of the sperm tails had degraded yet because they were deposited close to the time of death. Under

any testimony presented it would be illogical for the sperm tails to still be present if Williams had not had sex with Erin since July 2, 2017.

(*Id*. at pp. 131-32, ¶ 101 (emphasis in original).)

Mr. Williams contends that the court of appeals's finding that the presence of sperm tails in the victim supported the inference that Mr. Williams was with the victim on July 5, 2017, was unreasonable since the State's witnesses "gave conflicting testimony regarding the length of time sperm and sperm tails survive in a living individual."  (ECF Doc. 1, p. 8.)  He also argues that:

> Even accepting these statements as true to explain why some of Appellant's sperm still had tails when found in Mulcahy, the evidence does not support the State's theory. The State placed Mulcahy's time of death between 6:45 p.m. and 7:32 p.m. on July 5, 2017, which would have required Appellant to have ejaculated in Mulcahy sometime between 6:45 a.m. and 11:32 a.m. This would require Appellant to be with Mulcahy during this time, but Appellant was at work from 5:56 a.m. to 2:00 p.m.

(*Id*.; *see also* ECF Doc. 10, pp. 9-10.)  And asserts that:

> [He] admitted to the police and to the jury that he had sex with his wife on July 2, 2017. *Doc 6-3, trial transcript at PageID # 1131-1132.* Dr. Spitz testified that this sperm would be there longer than three days. *Doc 6-2, Deposition of Dr. Sptiz, at pageid # 303.* There was testimony that the Petitioner was at work on July 5, 2017. *Doc 6-3, Trial transcript, at pageID # 1133-1134.* This testimony is entirely corroborative with theory that he has sex with his wife on July 2 and that she passed away from a seizure in the shower on July 5.

(ECF Doc. 10, p. 10 (emphasis in original).)

As an initial matter, as previously explained, "[c]ircumstantial evidence alone is sufficient to support a conviction," *Johnson*, 200 F.3d at 992.  Thus, the state court of appeals's determination is not unreasonable simply because the evidence was circumstantial.

Next, while there was some conflicting testimony offered by the State's witnesses regarding the length of time that sperm tails would survive— Dr. Scala-Barnett testified that in a living person sperm tails could survive 24-36 hours (ECF Doc. 6-1, pp. 114-15, ¶ 49), but a forensic scientist from BCI testified that that sperm tails only last eight to twelve hours in a

living individual (*id.* at p. 115, ¶ 50)—Mr. Williams fails to show that these inconsistencies demonstrate that the state court of appeals's determination was unreasonable.  The state court of appeals acknowledged this differing testimony but concluded that the evidence, when construed in the light most favorable to the prosecution, supported Mr. Williams's murder conviction.

The undersigned also finds unavailing Mr. Williams argument that the State's theory is unsupported even if one accepts the testimony that the fastest sperm tail deterioration rate was eight to twelve hours after intercourse.  Apparently calculating back eight to twelve hours before the projected time of death—to between 6:45 a.m. and 11:32 a.m. on July 5, 2017—he argues that the sperm tails would only have been present under the State's theory if he ejaculated in his wife during a time when he was at work.  (ECF Doc. 1, p. 8; ECF Doc. 10, p. 10.)  This is not correct.  Construing the relevant evidence in the light most favorable to the State, sperm tails would also be present if Mr. Williams had sexual intercourse with the victim shortly before her death, after his workday was complete.  Accordingly, Mr. Williams has not shown that the state court unreasonably found the evidence regarding sperm tails, when construed in the light most favorable to the prosecution, supported the inference that Mr. Williams was "not only in the area, but also with Erin," at the time of her death.  (ECF Doc. 6-1, p. 123, ¶ 74.)

Finally, Mr. Williams's contention that the evidence supports his own theory that he had sexual intercourse with his wife on July 2, but not on July 5, is insufficient to establish that the state court of appeals's contrary determination was unreasonable.  *See Burt*, 571 U.S. at 18 ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (internal citations and quotations omitted).  To support his theory, Mr. Williams relies on Dr. Spitz's testimony that sperm would be present for three or four days after sexual intercourse.  (ECF Doc. 10, p. 10

41

(citing ECF Doc. 6-2, p. 43).)  But Dr. Spitz acknowledged that tails are the first thing that sperm lose and offered no specific testimony as to how long it would take for sperm tails to deteriorate. (ECF Doc. 6-2, p. 43.)  Thus, although Dr. Spitz testified that sperm could be present longer than three days, he provided no testimony to explain how sperm *tails* would remain after three days. (ECF Doc. 6-1, p. 114, ¶ 48.)  Construing this evidence in the light most favorable to the prosecution, the state court of appeals's determination cannot be deemed unreasonable.

The state court of appeals was presented with and considered the evidence that Mr. Williams contends supports his claim that he was not present with the victim at the time of her death, and therefore could not have murdered her.  Nevertheless, the state court of appeals found that the evidence did not support Mr. Williams's theory.  Mr. Williams also contends that that the state court of appeals' factual findings were unreasonable in light of the evidence, but he has not rebutted the state court of appeals's factual findings by clear and convincing evidence or shown that the state court's findings lacked evidentiary support.  The Court "must . . . defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205; *see also White*, 602 F.3d at 710.

Based on the record before this Court, the undersigned cannot find that the state court of appeals unreasonably applied *Jackson* or that the state court of appeals's finding that Mr. Williams was "not only in the area, but also with Erin," at the time of her death (ECF Doc. 6-1, p. 123, ¶ 74) was an unreasonable determination in light of the evidence.

For the reasons set forth above, the undersigned does not find under 28 U.S.C. § 2254(d)(1) that the state court of appeals unreasonably applied *Jackson* when it found there was sufficient evidence upon which the trier of fact found Mr. Williams guilty of murder.  Further, the undersigned does not find under 28 U.S.C. § 2254(d)(2) that the state appellate court's

finding of sufficient evidence to support the conviction of murder was based on an unreasonable determination of facts in light of the evidence.

## IV.     Recommendation

Accordingly, the undersigned recommends that the Court **DENY** the Petition.


December 19, 2024                                 /s/ Amanda M. Knapp
                                                 AMANDA M. KNAPP
                                                 UNITED STATES MAGISTRATE JUDGE



## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).